FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO    2016 NOV 29  PM 1: 09

JEFFREY P. COLWELL
CLERK

John C. Price    '16 - CV - 0 2 9 0 5

BY_____DEP. CLK

Plaintiff

v.

Loretta Lynch,  Attorney General of the United States

Defendant

## I.  Opening statement

1.    As the Colorado legislature failed to create districts for the House of Representatives after the 2010 census, the Denver District Court accepted a proposed redistricting plan which was affirmed on appeal by the Colorado Supreme Court.  The plan greatly limits voter choice, as many districts have a political party so dominant that opposition candidates cannot win.  Plaintiff requests choice in determining his Representative by acceptance of districts using his methodology.

## II.  Parties

2.    Plaintiff is registered voter in the Second Congressional District of the state of Colorado, living at 765 10th Street, Boulder Colorado, 80302.
The Attorney General of the United States has the responsibility to ensure that constitutional provisions are enforced.

## III.  Jurisdiction and Venue

3.    Jurisdiction of this case is grounded in 28 US Code—Section 1331: The Federal Question

1

> The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

4.    Jurisdiction of this case is grounded in 28 US Code—Section 1331: The

Courts of the United States have jurisdiction to interpret the meaning of the

Constitution Article I, Section 2.

> The House of Representatives shall be composed of members chosen every second year by the people of the several states, and the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature.

5.    Jurisdiction of this case is grounded in 28 US Code—Section 1331: The

Federal Question

5.    The Courts of the United States have jurisdiction to interpret the meaning of

the Supremacy Clause Article VI, Clause 2

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

6.    Jurisdiction of this case is grounded in 28 US Code—Section 1331: Federal

Question, as this case requires the Court to interpret the "Equal Protection" provisions

of the Fourteenth Amendment to the Constitution, Section 1.

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

7.    Jurisdiction of this case is grounded in 28 US. Code 1651 – Writs

2

> The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

8.   Jurisdiction for this case is grounded in 28 US. Code § 2201  (a) Creation of remedy

> In a case of actual controversy within its jurisdiction, .......... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

9.   Venue of this case is proper under the provisions 31 U. S. C. 1391  A civil action may be brought in—

> (b) (2) Venue in General
> a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;
>
> (c) Residency.—For all venue purposes— (1)
> a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled;

### IV.  Background of this civil action

10.   Although some delegates at the Constitutional Convention were labeled federalist or anti-federalist, at that time there were no political parties, which originated during the presidency of George Washington.  After the 1810 census, knowledge of the distribution of population and political sentiments enabled the dominant party in the Massachusetts legislature to redistrict in favor of its own party in the Massachusetts senate.  Though recognized previously, this procedure was named for the presiding Governor Gerry, thus: gerrymander.  For the past 150 years either the Republican or

3

Democratic Party has controlled the federal government, with minor parties having slight importance from time to time.  Not recognizing the significance of the future political parties, the Founders left weaknesses in the selection mechanisms for both the Senate and the House of Representatives.  From time to time state legislatures could not reach agreement on a federal senator, resulting in a vacancy.  The 17th amendment (1915) ended state legislative responsibility and replaced it by election by the People.

11.    The decennial redistricting for the House has led to numerous lawsuits alleging gerrymandering as well as action by the courts when state legislatures failed in their responsibility.  Separation of powers between the judicial and legislative branches and lack of clear criteria have prevented the courts from establishing a specific legal basis for redistricting.  (Vieth v. Jubelirer, 541 US 267 - Supreme Court 2004)

12.    At the time of the Convention the country was relatively primitive.  Creating districts was a laborious task accomplished by drawing boundaries and accumulating population figures for the various precincts.  Gerrymandering required, in addition, knowledge of the distribution of voters between parties.  Meanwhile technology and science steadily moved on, producing (in the approximate year of widespread use) the locomotive (1830), telegraph (1840), typewriter (1870), electric power (1880), and the electronic computer (1960).   But usable tools for combining maps, population figures and voter preferences to support gerrymandering are more recent.

13.   Precise separation of state populations into Republican and Democratic districts is now facilitated by graphical/image technology (1990), with the dominant party in a state legislature creating an advantage for itself in the federal House. This has

4

largely eliminated voter choice in choosing House members. Due to the inability of the legislature to create districts in 2011 the Denver district court accepted a plan proposed by Hall and Moreno (District Court 11CV3461 and 11CV 3463, 2011) and affirmed by the Colorado Supreme Court (11SC842, 2012 CO 14). Though consistent with Colorado law plaintiff's district is strongly dominated by one party (Democratic), leaving no alternative to a Democratic representative. The 2003 court approved plan (People ex rel. Salazar v. Davidson, 79 P. 3d 1221 - Colo: Supreme Court 2003) had the same effect as well as forbidding a second redistricting between censuses. Plaintiff requests acceptance of his plan and procedure.

## V.  Count 1 – Violation of the U. S. Constitution, Article I  section 2

14.    Plaintiff addresses a property ascribed to "the People", but complains as an individual. Some form of class action would be feasible, or Plaintiff could request a declaration for all U. S. citizens, or for those in the state of Colorado, or only for those in Colorado district 2 who, together with plaintiff, will benefit from the requested redistricting. Considering choice as a primary goal in redistricting, plaintiff asks for redress for the last, leaving for the courts to select domain affected by a positive outcome. Others will follow if plaintiff succeeds but the redress is local.

15.    Plaintiff's vote for a member of The House of Representatives is ineffective because district voter populations enable the Democratic Party to choose the winner prior to the general election. Plaintiff lives in Colorado district 2, whose representative Jared Polis had a victory margin of 19.5% in the most recent election, placing the election beyond the reach of a Republican (or any)

5

opponent(s).  There is no simple means to establish that the winner was predetermined, so one must assess the issue based on statistical information.

16.    Results for district 2 for the past 14 years (8 elections) are:

Table 1    District 2 voting history

| Year | Democratic Candidate | Republican Candidate | (all) Democratic Victory Margin |
|------|---------------------|---------------------|--------------------------------|
| 2016 | Polis | Morse | 19.5 |
| 2014 | Polis | Leing | 13.4 |
| 2012 | Polis | Lundberg | 17.4 |
| 2011 Redistricting shifted some boundaries | | | |
| 2010 | Polis | Bailey | 19.5 |
| 2008 | Polis | Starin | 28.7 |
| 2006 | Udall | Mancuso | 40.0 |
| 2004 | Udall | Hackman | 36.8 |
| 2002 | Udall | Hume | 23.3 |

17.    The previous 10 years, 1992 – 2000, also did not lead to a party change. The winning margin was a low of 2.5% in 1998, when the Republican candidate was the former mayor of the city of Boulder, the district's largest city.  Such variations are to be expected.

18.    District 2 is a "safe" = guaranteed Democratic district.  Virtually all characteristics such as candidates personalities, campaign, position on issues, backgrounds, etc. do not alter the election outcome.  However, this status is not

absolute.  Personal corruption, inflammatory statements, an unusual position on an issue, etc., may lead to the defeat of a candidate in an otherwise safe district.  On rare occasions general public anger may translate into a substantial voting shift across the political spectrum or against an individual.

19.    The safety/noncompetiteveness of seats in the seven Colorado districts may be assessed from Table 2.

| Table 2 | Winner's Voting Margins District | | | | | | |
|---------|------|------|------|------|------|------|------|
| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 2016 | **39.1** | **19.5** | *13.4* | *32.7* | *31.6* | *9.0* | **14.8** |
| 2014 | **36.8** | **13.4** | *22.3* | *35.5* | **9.6** | *8.9* | **10.2** |
| 2012 | **41.1** | **17.4** | *12.4* | *21.9* | *U* | *3.6* | **12.1** |
| 2011 Redistricting above | | | | | | | |
| 2010 | **38.6** | **19.5** | *4.3* | *11.1* | *36.5* | *34.2* | **11.6** |
| 2008 | **48.1** | **28.7** | **23.2** | **12.4** | *23.0* | *21.4* | **27.0** |
| 2006 | U | **40.0** | **25.1** | *2.5* | *19.2* | *18.7* | **12.8** |
| 2004 | **49.2** | **36.8** | **3.9** | *6.2* | *43.6* | *20.5* | *11.9* |
| 2002 | **36.7** | **23.3** | *34.6* | *13.3* | *44.7* | *36.9* | *0.1* |

Democratic margins in **Boldface,** Republican in *italics*

U = Unopposed by opposite party

20.    Districts 1, 2, and 7 are safe Democratic, districts 4 and 5 are safe Republican.  The 2011 redistricting altered district 3, which is now probably safe Republican, while district 6 is mildly competitive.

7

21.   The difference values (less than 5% = competitive), (5-10% = weakly competitive or "leaning"), (greater than 10% = safe) are commonly cited, but these must be established over a series of elections, as above.   When the preelection difference between two candidates is near zero the race is even, a tossup.   As the preelection difference increases the likelihood decreases that the candidate of the lesser party will win.   For a margin greater than 10% the candidate of the lesser party essentially has no chance.

22.   The lack of competition is nationwide, as described in November, 2016 on the web site ballotpedia.org.

Seats won by each party based on margin of victory
in 2014 United States House of Representatives Elections

| Party | 0-5% | 5-10% points | 10-20% points | 20% points or more |
|---|---|---|---|---|
| Democratic | 15 | 15 | 32 | 126 |
| Republican | 11 | 8 | 36 | 192 |
| Totals | 26 | 23 | 68 | 318 |

Of the 435 seats about 10% were competitive or marginally competitive.

### VI.  Injury

23.  Plaintiff has two principle legal rights from the U. S. Government: the right to choose/vote, and the right to sue for a withheld right.  The first is the readily available means to affect the government while the second is time consuming, difficult, and uncertain, but sometimes necessary.  Plaintiff regards disenfranchisement as a serious and specific injury.

8

**VII.   Count 2 – Violation of the U.S. Constitution-Article VI**
**clause 2 - The Supremacy Clause**

24.   Plaintiff's vote's loss of choice results from the 2011 redistricting following the 2010 census and will continue until the next redistricting..  The Colorado Circuit Court accepted a proposed plan which was affirmed by the Colorado Supreme Court.

25.   Each state creates districts according to state and federal law.  States determine their own rules in establishing district boundaries, except for two federal requirements:

Equal district populations within a state, i.e. one man, one vote,  369 U.S. 186

 Baker v. Carr (No. 6)

No discrimination toward minorities.  Civil Rights act Public Law 90-284, 82 Stat. 73

26.   The Colorado Supreme Court 2003 decision (Salazar vs Davidson, supra) introduced a new criterion in response to an attempt to alter a lower court's redistricting the previous year.

In short, the state constitution limits redistricting to once per census, and nothing in state or federal law negates this limitation. Having failed to redistrict when it should have, the General Assembly has lost its chance to redistrict until after the 2010 federal census.

27.   Additional factors  (State law section 2-1-102, C.R.S. 2011) were considered in the 2011 districting plan.

(1) [I]n adopting or enforcing any change to any [congressional] district, courts:
    (a) Shall utilize the following factors:

9

(I) A good faith effort to achieve precise mathematical population equality between districts, justifying each variance, no matter how small, as required by the constitution of the United States. Each district shall consist of contiguous whole general election precincts. Districts shall not overlap.

(II) Compliance with the federal "Voting Rights Act of 1965", in particular 42 U.S.C. sec. 1973; and

(b) May, without weight to any factor, utilize factors including but not limited to:

(I) The preservation of political subdivisions such as counties, cities, and towns. When county, city, or town boundaries are changed, adjustments, if any, in districts shall be as prescribed by law.

(II) The preservation of communities of interest, including ethnic, cultural, economic, trade area, geographic, and demographic factors.

(III) The compactness of each congressional district; and

(IV) The minimization of disruption of prior district lines.

28.   The desirability of competitiveness was introduced by some legislators, although it is not present in Colorado law.  (Hall, ibid. footnote pages 26, 27)

In debate before both the House and Senate in 2010 in passing the bill to amend section 2-1-102, HB 10-1408, a number of legislators that supported the bill explicitly framed their support based upon the repeal of the prohibition on the consideration of so-called "non-neutral factors." These legislators explained that their support for the bill stemmed from a desire to allow a trial court to consider political affiliations and the competitiveness of judicially-adopted districts in the event that the General Assembly failed to adopt new district boundaries. See, e.g. House Floor Debate on H.B. 1408 Before the Full House, 67th Gen. Assembly, 2d Reg. Sess., 2d Reading (Apr. 29, 2010) (statement of Rep. Paul Weissman, H. Maj. Leader) (arguing that the prohibition on the consideration of "non-neutral factors" should be removed because competitive districts would further his belief that "voters ought to feel as if their vote matters, as if their vote can make a difference"); Senate Floor Debate on H.B. 1408 Before the Full Senate, 67th Gen. Assembly, 2d Reg. Sess., 2d Reading (May 10, 2010) (statement of Sen. John Morse, Sen. Maj. Leader) **(arguing that the creation of competitive districts with even numbers of Republican, Democratic, and Unaffiliated voters forces the elected representative to be "accountable to the people").**  (Bold face added by plaintiff Price)

29.   The Colorado Supreme Court decision (2012) reviewed a careful and systematic application of Colorado law.  Competitiveness was included in their analysis together with factors specified in law.  However as in table 2, five districts are not competitive; the other 2 are marginally competitive.  The court did not weight strongly balance and competitiveness, i. e. choice, as specified in the Constitution.  No criticism is directed toward the Colorado court, which must rule on the issues brought before it.

30.   The values in 1 (b) tend to be contradictory to the concepts of balance in elections.  Preservation of communities of interest, including ethnic, cultural, economic, trade area, geographic, and demographic factors run contrary to the national values.  Separation of ethnic groups, different degrees of wealth, cultural values, and education levels are encouraged by placing them in separate House districts, one type in Republican districts, the other/contrasting type in Democratic districts.  The relative uniformity within districts is pleasing to the inhabitants but leads to political polarization in state and federal legislatures.   It is these factors that are largely obliterated by constructing districts to preserve communities of interest.   The separation of races in schools is now forbidden, as is discrimination in voting rights.  Separation of parties and resulting lack of balance is evident in 90% – 95% of House elections, but in legal actions the partisan nature of districting is seldom acknowledged.

31.   Choice implies a balance or near balance between numbers of Democratic and Republican party voters in an election district.  When one party is strongly dominant the majority candidate is guaranteed election.  This also occurs if no candidate or only one seeks office.   However voter participation is also important, so

11

both parties must work to get their supporters to vote, as well as seek the vote of independents.

32.   Plaintiff must demonstrate that districts may be created which meet his demand.  This is achieved using a free, publicly available computer program, Daves Redistricting, created by David Bradlee, and available on the world wide web.  The program incorporates the necessary precinct maps of population and party voting.

http://gardow.com/davebradlee/redistricting/launchapp.html

33.   To create a district with Daves Redistricting one selects (highlights) precincts on a map as if selecting text in a word processing document.  At the screen edge is a running tally of population, and the Republican and Democratic votes with their percentages of the accumulated vote.   Maintaining equal population districts to within 1% (one man, one vote) is straightforward, but balancing the party votes to 1% takes more effort.  The difference should be within 1%, as larger imbalances lead to increasing advantage for the candidates of the larger party.  Plaintiff has analyzed 49 states (precinct data are not available for Oregon), leading to 186 balanced districts.

34.  The program utilizes precinct populations from the 2010 census and voter data from the 2008 presidential election. Finding values for party voting strength is challenging.  A presidential election represents a uniform condition from state to state.  Midterm elections may be excluded because voting numbers are generally lower by 25-30% and thus are less representative.  Party registration figures are not useful because: a) many people do not register a party affiliation, b)  Some registered voters do not vote, and c) no verification is required, so people can register with one party even it they

12

support the other.  More recent data are not available for all states in the Daves

Redistricting program.  Use of the 2008 presidential data set does not preclude use of

an alternative data set, subject to court approval.

    35.   The seven districts defined by the plaintiff are numbered arbitrarily, as their

borders do not correspond to the present districts.  (See exhibit 1).  Party differences are

listed in increasing order.

Plaintiff-Price  **0.1%**,   0.2%,   0.2 %,   0.7%,   **6.7%**,   **14.4%**,   **42.6%**.

For comparison the election results are listed for the recent 2016 election and

2008, the year used in Daves Redistricting.

| Table 2 | | Winner's Voting Margins District | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Year 2016 | **39.1** | **19.5** | *13.4* | *32.7* | *31.6* | *9.0* | **14.8** |
| 2011 Redistricting above | | | | | | | |
| 2008 | **48.1** | **28.7** | **23.2** | **12.4** | *23.0* | *21.4* | **27.0** |

    36.   The first 4 of plaintiff's districts are balanced to within 1% and the

fifth to within 6.7%.  All five have victory margins less than *any* of those in

existing districts in 2008 and 2016.  Thirteen of the fourteen election results

exceed in difference the nominal 10% limit for a competitive election.

    37.   The requested plan may produce racial disparities among the

districts.  Nothing in plaintiff's request is discriminatory; the sole consideration is

providing voter choice by minimizing numerical differences between parties'

voters.  The Equal Protection Clause does not forbid governmental policies that

unintentionally lead to racial disparities.  Arlington Heights v. Metropolitan Housing

Development Corp. 429 U.S. 252 (1977)

> "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Disparate impact merely has an <u>evidentiary</u> value; absent a "stark" pattern, "impact alone is not determinative."

    38.   Notice appeared several days ago of a court decision in Wisconsin declaring the state districts unconstitutional due to gerrymandering.  Full detains are not available, but are sufficient for a comparison with this complaint.

**Comparison of Plaintiff with Wisconsin procedures**

1. Variable used in analysis

    Plaintiff  -  difference percentage between winner and loser in a district

    Wisconsin -  same, except named efficiency index

2. Purpose

    Plaintiff –   Create balanced (by party) districts using Daves Redistricting or any equivalent method

    Wisconsin -   reduce efficiency index in districts

3. Result

    Plaintiff –   as many balanced districts as possible by analyzing state map

    Wisconsin -   unspecified – There are many possibilities

4. Legal basis

    Plaintiff –   elector choice, per Constitution, Article I, Section 2

    Wisconsin -   unknown

5. Applicability

| Plaintiff – | jurisdictions requiring choice in law or Constitution |
| Wisconsin  - State level.  Partisan considerations excluded in federal court |

Plaintiff's districts are not excluded by the efficiency index approach.

## VIII.  PRAYERS FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1. A DECLARATION that voter choice is the principal criterion for redistricting for the federal House of Representatives.

2. A DECLARATION that the U. S. Constitution and federal law take precedence over state law in the redistricting process for the House of Representatives.

3   A DECLARATION that the plaintiff's redistricting request of Exhibit 1 immediately replace the current districts.  Enforcement of Article I, Section 2 should not be delayed until after the next census.

4. A DECLARATION that allows plaintiff or his designees to assist with and/or verify implementation by the states in order to eliminate errors and possible questions.

5.  A DECLARATION that future changes of precinct boundaries are subject to court review in order to prevent defeat of the procedure by enlarging precincts. The result of this request may be defeated by enlargement of precincts so that precision in defining boundaries is lost.  Modern technology for voting and counting makes feasible the combination of precincts to produce much larger

15

precincts.  Vote reporting must be continued for the present size precincts, even if other aspects are combined (polling places, tabulation points, etc.).

## IX.  Further Considerations

39.  Plaintiff suggests the court recommend to the legislative and administrative branches that data from federal elections be maintained at the federal level.  At present obtaining such voting records is difficult and time consuming because states have no standard format for data and data are dispersed within states. Precinct records for Oregon are not available and probably do not exist.

40.  Election irregularities are more likely with increasing reliance on technology. Evidence of tampering with elections will diminish public confidence in the process. Fraudulent ballots are unlikely when thousands are needed to have any effect and stuffing ballot boxes is possible but unlikely.  However electronic manipulation may not be detected unless baseline (historical) voting patterns are available for comparison. These should be saved in a secure place and common format.

41.  A study is needed to estimate party numbers more precisely for defining House districts. Results may be from the most recent presidential election, or the similar Cook partisan voting index, which averages results of the previous two presidential elections. Any one election is subject to undue effect in case of a highly unequal vote for president. The next redistricting in 2021 will benefit from study of this question.

16

42.  Districts are defined at the precinct level, which often does not respect official boundaries (county, municipality, etc.).  This is well within the ability of existing technology, as is demonstrated by current Pennsylvania district 17.  See exhibit 2.

43.  A disruption of incumbent representatives is likely when changing from a minimal number to a maximum number of competitive districts. The political parties need time to adopt strategies for the newly requested districts.

*John C. Price*
*765 10th Street*
*Boulder CO 80302*
*303-939-9991*
*November 29, 2016*

17



**Exhibit 1**

**Colorado – Plaintiff's Districts**

**Exhibit 1**

# Colorado   -   Plaintiff's Districts

2008      Presidential      Vote

| District | Population | Total Vote | Democratic Vote | Republican Vote | % Republican | % Democratic | % Dem–Rep |
|---|---|---|---|---|---|---|---|
| 1 | 719986 | 352108 | 172818 | 173529 | 49.08% | 49.28% | -0.20% |
| 2 | 720791 | 312696 | 154773 | 152720 | 49.50% | 48.84% | 0.66% |
| 3 | 717190 | 327284 | 230651 | 91143 | 70.47% | 27.85% | 42.63% |
| 4 | 719969 | 371490 | 195057 | 170264 | 52.51% | 45.83% | 6.67% |
| 5 | 716961 | 385053 | 189872 | 189321 | 49.31% | 49.17% | 0.14% |
| 6 | 716106 | 341096 | 192068 | 142796 | 56.31% | 41.86% | 14.45% |
| 7 | 718193 | 311517 | 153188 | 153844 | 49.17% | 49.39% | -0.21% |

**Exhibit 1**

## Colorado   -   Plaintiff's Districts

| GeoID2 | District | Name | County | Total P | White | Black | Hispanic | Asian | Nativ | Other | Pres08 | PresC | Pres0 |
|--------|----------|------|--------|---------|-------|-------|----------|-------|-------|-------|--------|-------|-------|
| 800101108 | 7 | Adams 108 | Adams | 1354 | 503 | 10 | 805 | 11 | 6 | 19 | 250 | 148 | 90 |
| 800101109 | 7 | Adams 109 | Adams | 2936 | 930 | 72 | 1874 | 9 | 24 | 27 | 515 | 300 | 193 |
| 800101098 | 6 | Adams 98 | Adams | 3135 | 1791 | 60 | 1123 | 61 | 7 | 93 | 1117 | 666 | 431 |
| 800101037 | 6 | Adams 37 | Adams | 1637 | 1236 | 15 | 193 | 162 | 1 | 30 | 1035 | 549 | 477 |
| 800101110 | 7 | Adams 110 | Adams | 4025 | 1282 | 39 | 2633 | 18 | 21 | 32 | 881 | 629 | 241 |
| 800101111 | 6 | Adams 111 | Adams | 2091 | 674 | 28 | 1359 | 3 | 5 | 22 | 473 | 336 | 125 |
| 800101113 | 6 | Adams 113 | Adams | 2819 | 846 | 50 | 1857 | 18 | 15 | 33 | 683 | 473 | 188 |
| 800101077 | 6 | Adams 77 | Adams | 2794 | 2148 | 22 | 376 | 176 | 10 | 62 | 1388 | 807 | 561 |
| 800101184 | 1 | Adams 184 | Adams | 255 | 207 | 4 | 39 | 1 | 3 | 1 | 187 | 89 | 92 |
| 800101117 | 6 | Adams 117 | Adams | 3763 | 904 | 117 | 2663 | 9 | 23 | 47 | 746 | 528 | 203 |
| 800101207 | 1 | Adams 207 | Adams | 222 | 183 | 1 | 31 | 0 | 0 | 7 | 102 | 23 | 77 |
| 800101204 | 1 | Adams 204 | Adams | 246 | 210 | 4 | 23 | 6 | 1 | 2 | 123 | 29 | 90 |
| 800101203 | 1 | Adams 203 | Adams | 163 | 132 | 1 | 25 | 5 | 0 | 0 | 69 | 26 | 43 |
| 800101202 | 1 | Adams 202 | Adams | 779 | 622 | 21 | 122 | 5 | 1 | 8 | 371 | 122 | 235 |
| 800101209 | 1 | Adams 209 | Adams | 1203 | 1041 | 1 | 126 | 8 | 13 | 14 | 471 | 153 | 302 |
| 800101188 | 1 | Adams 188 | Adams | 1895 | 1614 | 12 | 228 | 9 | 11 | 21 | 1063 | 380 | 670 |
| 800101101 | 7 | Adams 101 | Adams | 2238 | 1424 | 76 | 593 | 77 | 17 | 51 | 795 | 449 | 338 |
| 800101036 | 6 | Adams 36 | Adams | 1434 | 1194 | 17 | 106 | 90 | 2 | 25 | 931 | 499 | 417 |
| 800101116 | 6 | Adams 116 | Adams | 3157 | 908 | 42 | 2139 | 12 | 20 | 36 | 712 | 495 | 199 |
| 800101118 | 6 | Adams 118 | Adams | 3893 | 940 | 167 | 2686 | 17 | 25 | 58 | 798 | 599 | 176 |
| 800101004 | 6 | Adams 4 | Adams | 459 | 194 | 8 | 231 | 10 | 7 | 9 | 156 | 93 | 57 |
| 800101114 | 6 | Adams 114 | Adams | 2710 | 853 | 40 | 1767 | 10 | 7 | 33 | 662 | 450 | 195 |
| 800101035 | 6 | Adams 35 | Adams | 2826 | 2025 | 48 | 335 | 327 | 2 | 89 | 1396 | 891 | 486 |
| 800101129 | 6 | Adams 129 | Adams | 2700 | 1931 | 23 | 614 | 49 | 24 | 59 | 1335 | 751 | 552 |
| 800101169 | 6 | Adams 169 | Adams | 730 | 535 | 1 | 166 | 12 | 1 | 15 | 401 | 180 | 212 |
| 800101182 | 1 | Adams 182 | Adams | 2320 | 1545 | 25 | 593 | 75 | 26 | 56 | 859 | 423 | 425 |
| 800101186 | 1 | Adams 186 | Adams | 2776 | 1973 | 26 | 652 | 50 | 5 | 70 | 1195 | 559 | 620 |
| 800101187 | 1 | Adams 187 | Adams | 848 | 651 | 9 | 146 | 17 | 3 | 22 | 330 | 171 | 155 |
| 800101183 | 1 | Adams 183 | Adams | 2761 | 2047 | 31 | 550 | 57 | 6 | 70 | 1264 | 596 | 657 |
| 800101181 | 1 | Adams 181 | Adams | 1211 | 876 | 3 | 282 | 22 | 13 | 15 | 617 | 280 | 329 |
| 800101071 | 6 | Adams 71 | Adams | 2372 | 1786 | 60 | 387 | 77 | 14 | 48 | 1218 | 638 | 571 |
| 800101070 | 6 | Adams 70 | Adams | 1713 | 1357 | 40 | 208 | 82 | 6 | 20 | 856 | 440 | 403 |
| 800101040 | 6 | Adams 40 | Adams | 1659 | 1159 | 26 | 286 | 144 | 7 | 37 | 987 | 485 | 478 |
| 800101038 | 6 | Adams 38 | Adams | 2119 | 1695 | 16 | 231 | 138 | 10 | 29 | 1289 | 709 | 564 |
| 800101034 | 6 | Adams 34 | Adams | 2761 | 2206 | 33 | 280 | 182 | 6 | 54 | 1646 | 847 | 775 |
| 800101073 | 6 | Adams 73 | Adams | 964 | 819 | 8 | 82 | 32 | 4 | 19 | 579 | 283 | 292 |
| 800101076 | 6 | Adams 76 | Adams | 1699 | 1130 | 19 | 408 | 77 | 9 | 56 | 606 | 340 | 254 |
| 800101136 | 6 | Adams 136 | Adams | 2154 | 1052 | 68 | 837 | 117 | 29 | 51 | 581 | 391 | 181 |
| 800101180 | 1 | Adams 180 | Adams | 2698 | 1284 | 9 | 1337 | 18 | 9 | 41 | 813 | 403 | 386 |
| 800101178 | 1 | Adams 178 | Adams | 1204 | 888 | 6 | 287 | 7 | 3 | 13 | 570 | 260 | 295 |
| 800101177 | 1 | Adams 177 | Adams | 1090 | 798 | 1 | 259 | 16 | 1 | 15 | 690 | 307 | 375 |
| 800101176 | 1 | Adams 176 | Adams | 1172 | 662 | 6 | 442 | 37 | 11 | 14 | 544 | 273 | 264 |
| 800101173 | 1 | Adams 173 | Adams | 2907 | 1279 | 18 | 1551 | 14 | 17 | 28 | 944 | 533 | 389 |
| 800101162 | 6 | Adams 162 | Adams | 1285 | 949 | 33 | 185 | 83 | 9 | 26 | 521 | 235 | 279 |
| 800101161 | 6 | Adams 161 | Adams | 1977 | 1545 | 15 | 246 | 148 | 5 | 18 | 1002 | 474 | 512 |
| 800101158 | 6 | Adams 158 | Adams | 2183 | 1501 | 28 | 345 | 240 | 4 | 65 | 974 | 486 | 478 |
| 800101164 | 6 | Adams 164 | Adams | 1777 | 1170 | 31 | 417 | 114 | 5 | 40 | 724 | 430 | 287 |

**page 1 of 68**

Exhibit 2

# Pennsylvania  House District 17



**Exhibit 2**

# Pennsylvania  House District 17

